UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KERRY M. CASTELLO,           )
                             )
            Plaintiff,       )      C.A. NO. 05-10206-JLT
     v.                      )
                             )
SUSAN J. MARTIN, et al.,     )
                             )
            Defendants.      )

THIRD RULE 56(e) AFFIDAVIT
IN SUPPORT OF THE MEMORANDUM IN OPPOSITION TO
DEFENDANT, SUSAN J. MARTIN'S, MOTION FOR SUMMARY JUDGMENT
AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

I, Kerry M. Castello, depose and state:

1. My name is Kerry M. Castello, and to my personal knowledge
   the facts stated below are true.

2. On June 21, 2005, I submitted a public records request to
   the Massachusetts Department of Public Health, division of
   health professions licensure, seeking verification as to
   whether Susan J. Martin had a valid professional license, as
   well as to confirm whether she had a record of complaints
   filed against her.

3. On July 12, 2005, I received a letter from Traci A. Westgate
   stating that Susan J. Martin, R.N., had one complaint filed
   against her.  Said complaint was dismissed.

4. Hereto attached is a true copy of the letter from Traci A.
   Westgate (see Tab One, p. 1).

5. On August 5, 2005, I received a Certified Statement of
   Registration from Michael E. Bearse, Administrative
   Assistant, verifying that Susan J. Martin has a medical
   degree and that she was issued a professional license (i.e.,
   registered nurse #146258) on November 1, 1979.  The license
   expires on December 6, 2006.

6. Hereto attached is a true copy of the Certified Statement of
   Registration issued by the Assistant Administrator for the
   Board of Registration in Nursing (see Tab Two, p. 1).

7. On August 19, 2005 at 1:10 p.m., I met with an inmate name
   Anthony Gulla for the purpose of inspecting correspondence
   that he received from Susan J. Martin.  Mr. Gulla, at this
   time, produced an original letter from Ms. Martin stating

that she is the "Department's ADA Coordinator" and that his appeal for reasonable accommodation for his special need (ADA) is within her jurisdiction for response. Mr. Gulla has authorized me to use this letter as evidence to verify Ms. Martin's title and responsibility.

8. Hereto attached is a true copy of letter from Susan J. Martin dated May 9, 2005 (see Tab Three, p. 1).

9. I have personal knowledge that the State has a constitutional duty to provide me with adequate medical care while I am in its custody, irrespective of whether the State contracts out its medical care to a private medical provider. This issue was decided many years ago by the Supreme Judicial Court in West v. Atkins, 487 U.S. 42, 55-56 (1988).

10. Hereto attached is a true copy of West v. Atkins, 487 U.S. 42 (1988) (see Tab Four, pp. 1-11).

11. Policy 103 DOC 601 lays the foundations for the organization of the Massachusetts Department of Correction, health services division. The policy defines the responsible health authority and the organization of division management.

12. Hereto attached is a true copy of 103 DOC 601 (see Tab Five, pp. 1-21).

13. Policy 103 DOC 610 defines the qualifications and responsibilities of the clinical staff contracted to provide medical services in Department of Correction facilities, and it explains the role of the the Health Services Division with respect to the contractual medical provider.

14. Hereto attached is a true copy of 103 DOC 610 (see Tab Six, pp. 1-14).

15. All documents attached to this affidavit are identified and authenticated in compliance with Fed. R. Civ. 56(e), and they are to be used as evidence in support of the Memorandum in Opposition to the Defendant, Susan J. Martin's, Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment.

16. It is my contention that there is no genuine issue to be tried and that I am entitled to summary judgment as a matter of law.

I DECLARE AND VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON THIS $\underline{27th}$ DAY OF $\underline{August}$ , 2005.

Kerry M. Castello, Pro Se
P.O. Box 43
Norfolk, MA 02056

## CERTIFICATE OF SERVICE

I, Kerry M. Castello, hereby certify that a true copy of the above document was served upon each attorney of record for each other party by mail, first class, postage prepaid on this ___29th___ day of ___August___, 2005.

Kerry M. Castello, Pro Se

3





**The Commonwealth of Massachusetts**
Executive Office of Health and Human Services
Department of Public Health
Division of Health Professions Licensure
239 Causeway Street, Boston, MA 02114

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**RONALD PRESTON**
SECRETARY

**PAUL J. COTE, JR.**
COMMISSIONER

**JEAN K. PONTIKAS**
DIRECTOR

Office of Public Protection
Phone: (617) 973-0865        Fax: (617) 973-0985

July 8, 2005

Kerry M. Castello
P.O. Box 43
Norfolk, Ma 02056

Dear Kerry Castello,

The Office of Public Protection for the Massachusetts Department of Public Health, Division of Health Professions Licensure has received your correspondence on June 23, 2005 dated June 21, 2005.

Please be advised there is a fee charged for all public record requests. The fee charged is .20 cents a page and $14.00 an hour. We accept checks and no records will be released without first receiving payment for such records.

As for your record request, there was one (1) complaint for Susan J. Martin R.N., which has been dismissed. If you feel you need further information on said complaint, please be specific as to what it is you will need and I will comply with your request.

I have forwarded your request on to the licensing board for the additional information you have requested.

If you have any additional concerns and or questions or need further assistance please feel free to contact us.

Respectfully,
Traci A. Westgate





## The Commonwealth of Massachusetts
### Executive Office of Health and Human Services
### Department of Public Health
### Division of Health Professions Licensure
### Board of Registration in Nursing
239 Causeway Street, Suite 200, 2ⁿᵈ Floor, Boston, MA 02114
617-973-0800

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**TIMOTHY R. MURPHY**
SECRETARY

**PAUL J. COTE, JR.**
COMMISSIONER

**RULA HARB**
EXECUTIVE DIRECTOR

## Certified Statement of Registration

```
 REGISTERED NURSES          DATE: 07/19/2005
** LICENSE DATA **      ** NAME DATA **
BOARD CODE : RN           LAST NAME  (1A): MARTIN
LICENSE NO : 146258       FIRST NAME  (1B): SUSAN
TYPE  (1G):               MIDDLE INIT  (1C): J
** ELIGIBILITY DATA **
STATUS (1J): C
ISSUED (1K): 10 / 01 / 1979    ELIG.  (1M): 12 / 06 / 2004
D.O.B. (1L): 12 / 06 / 1951    EXPIRE (1N): 12 / 06 / 2006
EXAM  DATE     EXAM SCORE
07 / 11 / 1979         M 515
                       S 404
                       O 618
                       C 545
                       P 638
** EDUCATION **
SCHOOL  (3N): BUNKER HILL C C     DEGREE     (3O): AD
GRAD. YR. (3P): 1979   SCH. LOC. (3R): MA  MASSACHUSETTS
```

Michael E Bearse
**Administrative Assistant, Verifications**
**Board of Registration in Nursing**

OFFICIAL
SEAL

**Registration verification can be obtained over the Internet:**
**http://www.state.ma.us/reg/boards/rn**

*The information provided in this "Certified Statement" is based on the records maintained by the Massachusetts Division of Professional Licensure and its licensing boards. Individuals are deemed in good standing and not subject to any disciplinary status on the date of the issuance of the "Certified Statement." Disciplinary status is defined as a voluntary surrender, revocation, suspension, or probation of a license.*



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, M.A. 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

Kathleen M. Dennehy
*Commissioner*

James R. Bender
*Deputy Commissioner*

May 9, 2005

Anthony Gulla, W69795
MCI Norfolk
Norfolk, MA

Dear Mr. Gulla:

This is in response to your April 19, 2005 letter regarding the denial of your Request for Reasonable Accommodation of Special Need(s) (ADA).

First, I am aware that you are at MCI Norfolk. That is where I sent my response to your April 7, 2005 letter. There was no mention of MCI Cedar Junction that I am aware of, as was implied in your letter to me.

Second, as the Department's ADA Coordinator, your inquiry and appeal is within my jurisdiction for response. Therefore, I refer you back to my April 7, 2005 letter that answered your appeal regarding medication line accommodation. A copy of the April 7 letter is attached for your information.

Sincerely,

Susan J. Martin, Director

CC:    Kathleen M. Dennehy, Commissioner
       Veronica Madden, Associate Commissioner
       Christopher Mitchell, Deputy Superintendent, MCI Norfolk

other than one that goes to the very merits of the lawsuit, than the validity of a contractual forum-selection provision. Certainly, the *Erie* doctrine has previously been held to require the application of state law on subjects of similar or obviously lesser importance. See, *e.g., Walker, supra* (whether filing of complaint or service tolls statute of limitations); *Bernhardt v. Polygraphic Co. of America,* 350 U.S. ₍₄₎198, 202–204, 76 S.Ct. 273, 275–277, 100 L.Ed. 199 (1956) (arbitrability); *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S., at 555–556, 69 S.Ct., at 1229–1230 (indemnity bond for litigation expenses). Nor can or should courts ignore that issues of contract validity are traditionally matters governed by state law.

For the reasons stated, I respectfully dissent.



487 U.S. 42, 101 L.Ed.2d 40
₍₄₂₎Quincy WEST, Petitioner

v.

**Samuel ATKINS.**

**No. 87–5096.**

Argued March 28, 1988.

Decided June 20, 1988.

Inmate brought civil rights action against physician who was under contract with state to provide medical services and state officials. The United States District Court for the Eastern District of North Carolina granted officials and physician summary judgment and appeal was taken. The Court of Appeals for the Fourth Circuit, 799 F.2d 923, remanded. The District Court dismissed the claim and appeal was taken. The Court of Appeals, 815 F.2d 993, affirmed dismissal of complaint and petition was filed for writ of certiorari.

The Supreme Court, Justice Blackmun, held that physician who was under contract with state to provide medical services to inmates at state prison hospital on part-time basis acted under color of state law, within meaning of § 1983, when he treated inmate.

Reversed and remanded.

Justice Scalia, concurred in part and concurred in judgment and filed opinion.

**1. Civil Rights** ⟐13.3(1), 13.5(2)

To state claim under § 1983, plaintiff must allege violation of rights secured by Constitution and laws of United States, and must show that alleged deprivation was committed by person acting under color of state law. 42 U.S.C.A. § 1983.

**2. Civil Rights** ⟐13.5(2)

Definition of acting under color of state law requires that defendant in § 1983 action have exercised power possessed by virtue of state law and made possible only because wrongdoer is clothed with authority of state law. 42 U.S.C.A. § 1983.

**3. Civil Rights** ⟐13.5(2)

Defendant in § 1983 suit acts under color of state law when he abuses position given to him by state. 42 U.S.C.A. § 1983.

**4. Civil Rights** ⟐13.5(3)

Generally, public employee acts under color of state law within meaning of § 1983 while acting in his official capacity or while exercising his responsibilities pursuant to state law. 42 U.S.C.A. § 1983.

**5. Civil Rights** ⟐13.5(4)

A physician who was under contract with state to provide medical services to inmates at state prison hospital on part-time basis acted under color of state law, within meaning of § 1983, when he treated inmate; such conduct was fairly attributable to state. 42 U.S.C.A. § 1983.

(2)

ce Blackmun,
under contract
al services to
pital on part-
· of state law,
hen he treated

··

d in part and
filed opinion.

**3.5(2)**

1983, plaintiff
its secured by
ted States, and
eprivation was
under color of
983.

nder color of
idant in 1983
· possessed by
e possible only
d with authori-
A. § 1983.

uit acts under
abuses position
.S.C.A. § 1983.

yee acts under
ining of § 1983
ipacity or while
es pursuant to
983.

under contract
cal services to
spital on part-
r of state law,
vhen he treated
fairly attributa-
§ 1983.

**6. Civil Rights ⬅=13.7**

Defendants are not removed from purview of § 1983 action simply because they are professionals acting in accordance with professional discretion and judgment; there is no rule that professionals are subject to suit under § 1983 unless professional was exercising custodial or supervisory authority. 42 U.S.C.A. § 1983.

**7. Civil Rights ⬅=13.5(4)**

It is physician's function within state system, providing treatment to prison inmates, not precise terms of his employment, that determines whether his actions can fairly be attributed to state under § 1983. 42 U.S.C.A. § 1983.

**8. Civil Rights ⬅=13.5(4)**
**Prisons ⬅=17(2)**

Contracting out prison medical care does not relieve state of its constitutional duty to provide adequate medical treatment to those in its custody, and does not deprive state's prisoners of means of vindication of their Eighth Amendment rights under § 1983. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**9. Civil Rights ⬅=13.5(4)**

Fact that physician's employment contract with state did not require him to work exclusively for prison in treating prisoners did not make him any less state actor than if he performed duties as full-time, permanent member of state prison medical staff; rather, it was physician's function while working for state, not amount of time he spent in performance of those duties or fact that he might be employed by others to perform similar duties, that determined whether he was acting under color of state law. 42 U.S.C.A. § 1983.

**10. Civil Rights ⬅=13.5(3)**

Fact that state's employee's role parallels one in private sector is not, by itself, reason to conclude that former is not acting under color of state law within meaning

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the

108B S.Ct.—6

of § 1983 in performing his duties. 42 U.S.C.A. § 1983.

*Syllabus* *

Respondent, a private physician under contract with North Carolina to provide orthopedic services at a state-prison hospital on a part-time basis, treated petitioner for a leg injury sustained while petitioner was incarcerated in state prison. Petitioner was barred by state law from employing or electing to see a physician of his own choosing. Alleging that he was given inadequate medical treatment, petitioner sued respondent in Federal District Court under 42 U.S.C. § 1983 for violation of his Eighth Amendment right to be free from cruel and unusual punishment, relying on *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. The court entered summary judgment for respondent, holding that, as a "contract physician," respondent was not acting "under color of state law," a jurisdictional prerequisite for a § 1983 action. The Court of Appeals ultimately affirmed.

*Held:* A physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts "under color of state law," within the meaning of § 1983, when he treats an inmate. Pp. 2254–2260.

(a) If a defendant's alleged infringement of the plaintiff's constitutional rights satisfies the state-action requirement of the Fourteenth Amendment, the defendant's conduct also constitutes action "under color of state law" for § 1983's purposes, since it is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 937, 102 S.Ct. 2744, 2752, 2753. Thus, a state employee generally acts under color of state law when, while performing in his official capacity or exercising his official responsibilities, he abuses the position given to him by the State. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509, distinguished. Pp. 2255–2256.

reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

(b) The Court of Appeals erred in concluding that defendants are removed from § 1983's purview if they are professionals acting in accordance with professional discretion and judgment and that professionals may be liable under § 1983 only if exercising custodial or supervisory authority. The court's analogy between respondent and the public defender in *Polk County, supra,* is unpersuasive. Pp. 2256–2258.

(c) Respondent's conduct in treating petitioner is fairly attributable to the State. The State has an obligation, under the Eighth Amendment₄₃ and state law, to provide adequate medical care to those whom it has incarcerated. *Estelle, supra,* 429 U.S., at 104, 97 S.Ct., at 291; *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293. The State has delegated that function to physicians such as respondent, and defers to their professional judgment. This analysis is not altered by the fact that respondent was paid by contract and was not on the state payroll nor by the fact that respondent was not required to work exclusively for the prison. It is the physician's function within the state system, not the precise terms of his employment, that is determinative. Pp. 2258–2260.

815 F.2d 993 (CA4 1987) reversed and remanded.

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, WHITE, MARSHALL, STEVENS, O'CONNOR, and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 2260.

1. Doctor Atkins' contractual duties included the following: to provide two orthopedic clinics per week; to see all orthopedic and neurological referrals; to perform orthopedic surgery as scheduled; to conduct rounds as often as necessary for his surgical and other orthopedic patients; to coordinate with the Physical Therapy Department; to request the assistance of neurosurgical consultants on spinal surgical cases; and to provide emergency on-call orthopedic services 24 hours per day. His contract required him to furnish two days of professional

Adam Stein, Raleigh, N.C., for petitioner.

Jacob L. Safron, Raleigh, N.C., for respondent.

Justice BLACKMUN delivered the opinion of the Court.

This case presents the question whether a physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts "under color of state law," within the meaning of 42 U.S.C. § 1983, when he treats an inmate.

I

Petitioner, Quincy West, tore his left Achilles tendon in 1983 while playing volleyball at Odom Correctional Center, the Jackson, N.C., state prison in which he was incarcerated. A physician under contract to provide medical care to Odom inmates examined petitioner and directed that he be ₄₄transferred to Raleigh for orthopedic consultation at Central Prison Hospital, the acute-care medical facility operated by the State for its more than 17,500 inmates. Central Prison Hospital has one full-time staff physician, and obtains additional medical assistance under "Contracts for Professional Services" between the State and area physicians.

Respondent, Samuel Atkins, M.D., a private physician, provided orthopedic services to inmates pursuant to one such contract. Under it, Doctor Atkins was paid approximately $52,000 annually to operate two "clinics" each week at Central Prison Hospital, with additional amounts for surgery.[1] Over a period of several months, he treated

service each week in fulfillment of these duties. App. 24–25. Atkins also had supervisory authority over Department of Correction nurses and physician's assistants, who were subject to his orders. *Id.,* at 28.

Apparently, respondent maintained a private practice apart from his work at the prison. Atkins' submissions on his motion for summary judgment, however, do not reflect the extent of his nonprison practice or the extent to which he depended upon the prison work for his livelihood.

Case 1:05-cv-10206-JLT    Document 82-5    Filed 08/30/2005    Page 4 of 12

(4)

., for petitioner.

h, N.C., for re-

livered the

question whether
contract with the
services to in-
spital on a part-
or of state law,"
2 U.S.C. § 1983,
.

, tore his left Ac-
le playing volley-
Center, the Jack-
n which he was
n under contract
to Odom inmates
irected that he be
h for orthopedic
ison Hospital, the
y operated by the
1 17,500 inmates.
has one full-time
obtains additional
er "Contracts for
etween the State

tkins, M.D., a pri-
orthopedic services
one such contract.
was paid approxi-
y to operate two
entral Prison Hos-
ounts for surgery.[1]
months, he treated

llment of these duties.
had supervisory au-
of Correction nurses
, who were subject to

maintained a private
work at the prison.
s motion for summary
ot reflect the extent of
the extent to which he
on work for his liveli-

West's injury by placing his leg in a series of casts. West alleges that although the doctor acknowledged that surgery would be necessary, he refused to schedule it, and that he eventually discharged West while his ankle was still swollen and painful, and his movement still impeded. Because West was a prisoner in "close custody," he was not free to employ or elect to see a different physician of his own choosing.[2]

[45]Pursuant to 42 U.S.C. § 1983,[3] West, proceeding *pro se,* commenced this action against Doctor Atkins[4] in the United States District Court for the Eastern District of North Carolina for violation of his Eighth Amendment right to be free from cruel and unusual punishment.[5] West alleged that Atkins was deliberately indifferent to his serious medical needs, by failing to provide adequate treatment.

Relying on a decision of its controlling court in *Calvert v. Sharp,* 748 F.2d 861 (CA4 1984), cert. denied, 471 U.S. 1132, 105 S.Ct. 1132, 86 L.Ed.2d 283 (1985), the District Court granted Doctor Atkins' motion for summary judgment. In *Calvert,* the Fourth Circuit held that a private orthopedic specialist, employed by a nonprofit professional corporation which provided services under contract to the inmates at the Maryland House of Corrections [46]and the

Maryland Penitentiary, did not act "under color of state law," a jurisdictional requisite for a § 1983 action. Because Doctor Atkins was a "contract physician," the District Court concluded that he, too, was not acting under color of state law when he treated West's injury. App. 37.

A panel of the United States Court of Appeals for the Fourth Circuit vacated the District Court's judgment. 799 F.2d 923 (1986). Rather than considering if *Calvert* could be distinguished, the panel remanded the case to the District Court for an assessment whether the record permitted a finding of deliberate indifference to a serious medical need, a showing necessary for West ultimately to prevail on his Eighth Amendment claim. See *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

On en banc rehearing, however, a divided Court of Appeals affirmed the District Court's dismissal of West's complaint. 815 F.2d 993 (1987). In declining to overrule its decision in *Calvert,* the majority concluded:

"Thus the clear and practicable principle enunciated by the Supreme Court [in *Polk County v. [Dodson,]* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) ],

---

2. North Carolina law bars all but minimum-security prisoners from exercising an option to go outside the prison and obtain medical care of their choice at their own expense or funded by family resources or private health insurance. See North Carolina Division of Prisons Health Care Procedure Manual §§ 710.1–710.2 (1980), App. to Brief for Petitioner 15a–16a (promulgated pursuant to 5 N.C.Admin.Code § 02E.0203 (1987) and N.C.Gen.Stat. §§ 148–11, 148–19 (1987)). Petitioner is not a minimum-security prisoner.

3. Section 1983 provides in relevant part:
   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

4. Doctor Atkins is represented here by the Attorney General of North Carolina. By statute, the State provides for representation and protection from liability for any person who provides medical services to inmates and who is sued pursuant to § 1983. See N.C.Gen.Stat. § 143–300.7 (1987). The State has informed its contract physicians, however, that it will not provide them with representation and indemnification in malpractice actions.

5. West also named as defendants James B. Hunt, then Governor of the State of North Carolina, and Rae McNamara, Director of the Division of Prisons of the North Carolina Department of Correction. The District Court's dismissal of West's claims against Hunt and McNamara was affirmed on appeal. See 815 F.2d 993, 996 (CA4 1987). West has not pursued his actions against those defendants before this Court.

and followed in *Calvert,* is that a professional, when acting within the bounds of traditional professional discretion and judgment, does not act under color of state law, even where, as in *Dodson,* the professional is a full-time employee of the state. Where the professional exercises custodial or supervisory authority, which is to say that he is not acting in his professional capacity, then a § 1983 claim can be established, provided the requisite nexus to the state is proved." 815 F.2d, at 995 (footnote omitted).

The Court of Appeals acknowledged that this rule limits "the range of professionals subject to an *Estelle* action." *Ibid.*[6]

₄₇The dissent in the Court of Appeals offered three grounds for holding that service rendered by a prison doctor—whether a permanent member of a prison medical staff, or under limited contract with the prison—constitutes action under color of state law for purposes of § 1983. First, the dissent concluded that prison doctors are as much "state actors" as are other prison employees, finding no significant difference between Doctor Atkins and the physician-employees assumed to be state actors in *Estelle,* and in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). See 815 F.2d, at 997–998. Second, the dissent concluded that the "public function" rationale applied because, in the prison context, medical care is within "the exclusive prerogative of the State," in that the State is obligated to

provide medical services for its inmates and has complete control over the circumstances and sources of a prisoner's medical treatment. *Id.,* at 998–999, citing *Blum v. Yaretsky,* 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982). Finally, the dissent reasoned that the integral role the prison physician plays within the prison medical system qualifies his actions as under color of state law. 815 F.2d, at 999, citing *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966) ("[W]illful participant in joint activity with the State or its agents" may be liable under § 1983); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 931–932, 102 S.Ct. 2744, 2750–2751, 73 L.Ed.2d 482 (1982); and *Tower v. Glover,* 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984).

The Fourth Circuit's ruling conflicts with decisions of the Court of Appeals for the Eleventh Circuit, *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700 (1985), and *Ort v. Pinchback,* 786 F.2d 1105 (1986), which are to the effect that a physician who contracts with the State to provide medical care to prison inmates, even if employed by a private entity, acts under color of state law for purposes of § 1983.[7] We ₄₈granted certiorari to resolve the conflict. 484 U.S. 912, 108 S.Ct. 256, 98 L.Ed.2d 214 (1987).

## II

[1] To state a claim under § 1983, a plaintiff must allege the violation of a right

---

6. In addition, the Court of Appeals rejected petitioner's contention that the provision of medical services to inmates is an "exclusive state function." The court explained: "Decisions made in the day-to-day rendering of medical services by a physician are not the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public." *Id.,* at 996, n. 2, citing *Blum v. Yaretsky,* 457 U.S. 991, 1012, 102 S.Ct. 2777, 2790, 73 L.Ed.2d 534 (1982).

7. In their resolution of § 1983 cases, other Courts of Appeals implicitly have concluded that prison physicians act under color of state law when treating incarcerated persons. See, *e.g., Miranda v. Munoz,* 770 F.2d 255 (CA1 1985) (upholding jury verdict in § 1983 action against physician under contract with State to work

eight hours per week at jail); *Norris v. Frame,* 585 F.2d 1183 (CA3 1978) (pretrial detainee's § 1983 claim against, among others, a prison physician); *Murrell v. Bennett,* 615 F.2d 306 (CA5 1980) (reinstating inmate's § 1983 action against state prison physician); *Byrd v. Wilson,* 701 F.2d 592 (CA6 1983) (reinstating § 1983 action against medical staff, including two physicians, at state penitentiary); *Duncan v. Duckworth,* 644 F.2d 653 (CA7 1981) (allowing § 1983 action against prison hospital administrator to proceed until identity of responsible members of medical staff was determined); *Kelsey v. Ewing,* 652 F.2d 4 (CA8 1981) (upholding § 1983 action against contract physician at state prison).

its inmates and
r the circum-
soner's medical
citing *Blum v.*
.011, 102 S.Ct.
:1982). Finally,
he integral role
'ithin the prison
s actions as un-
5 F.2d, at 999,
-e, 383 U.S. 787,
16 L.Ed.2d 267
t in joint activi-
gents" may be
· *v. Edmondson*
–932, 102 S.Ct.
.2d 482 (1982);
· U.S. 914, 104
(1984).

ig conflicts with
Appeals for the
. *Prison Health*
· (1985), and *Ort*
)5 (1986), which
ysician who con-
provide medical
ı if employed by
:r color of state
3.⁷ We [48]grant-
ıe conflict. 484
98 L.Ed.2d 214

ınder § 1983, a
olation of a right

); *Norris v. Frame*,
(pretrial detainee's
ıg others, a prison
*nett*, 615 F.2d 306
ate's § 1983 action
n); *Byrd v. Wilson*,
(reinstating § 1983
 including two phy-
); *Duncan v. Duck-*
7 1981) (allowing
n hospital adminis-
ιtity of responsible
ıs determined); *Kel-*
\8 1981) (upholding
.ct physician at state

---

secured by the Constitution and laws of the
United States, and must show that the al-
leged deprivation was committed by a per-
son acting under color of state law. *Par-
ratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct.
1908, 1913, 68 L.Ed.2d 420 (1981) (overruled
in part on other grounds, *Daniels v.
Williams*, 474 U.S. 327, 330–331, 106 S.Ct.
662, 88 L.Ed.2d 662 (1986)); *Flagg Bros.,
Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct.
1729, 1733, 56 L.Ed.2d 185 (1978). Petition-
er West sought to fulfill the first require-
ment by alleging a violation of his rights
secured by the Eighth Amendment under
*Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct.
285, 50 L.Ed.2d 251 (1976). There the
Court held that deliberate indifference to a
prisoner's serious medical needs, whether
by a prison doctor or a prison guard, is
prohibited by the Eighth Amendment. *Id.*,
at 104–105, 97 S.Ct. at 291. The adequacy
of West's allegation and the sufficiency of
his showing on this element of his § 1983
cause of action are not contested here.⁸
The only issue before[49] us is whether peti-
tioner has established the second essential
element—that respondent acted under color
of state law in treating West's injury.

### A

[2] The traditional definition of acting
under color of state law requires that the
defendant in a § 1983 action have exercised
power "possessed by virtue of state law
and made possible only because the wrong-
doer is clothed with the authority of state
law." *United States v. Classic*, 313 U.S.
299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368
(1941). Accord, *Monroe v. Pape*, 365 U.S.
167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492
(1961) (adopting *Classic* standard for pur-
poses of § 1983) (overruled in part on other
grounds, *Monell v. New York City Dept.*

8. In his brief and at oral argument, respondent
insisted that West had failed to state a cause of
action under *Estelle*. He maintains that peti-
tioner's allegations "amount to no more than a
claim of medical malpractice" or "a negligence
based claim," which, under *Estelle*, 429 U.S., at
105–106, 97 S.Ct. at 292, are not sufficient to
make out a claim of cruel and unusual punish-
ment. No court has undertaken the necessary

---

*of Social Services*, 436 U.S. 658, 695–701,
98 S.Ct. 2018, 2038–2041, 56 L.Ed.2d 611
(1978); *Polk County v. Dodson*, 454 U.S.
312, 317–318, 102 S.Ct. 445, 449, 70 L.Ed.2d
509 (1981); *id.*, at 329, 102 S.Ct., at 455–456
(dissenting opinion). In *Lugar v.
Edmondson Oil Co., supra*, the Court
made clear that if a defendant's conduct
satisfies the state-action requirement of the
Fourteenth Amendment, "that conduct [is]
also action under color of state law and will
support a suit under § 1983." *Id.*, 457
U.S., at 935, 102 S.Ct., at 2752. Accord,
*Rendell–Baker v. Kohn*, 457 U.S. 830, 838,
102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982);
*United States v. Price*, 383 U.S., at 794, n.
7, 86 S.Ct., at 1157, n. 7. In such circum-
stances, the defendant's alleged infringe-
ment of the plaintiff's federal rights is
"fairly attributable to the State." *Lugar*,
457 U.S., at 937, 102 S.Ct., at 2753.

[3, 4] To constitute state action, "the
deprivation must be caused by the exercise
of some right or privilege created by the
State ... or by a person for whom the
State is responsible," and "the party
charged with the deprivation must be a
person who may fairly be said to be a state
actor." *Ibid.* "[S]tate employment is gen-
erally sufficient to render the defendant a
state actor." *Id.*, at 936, n. 18, 102 S.Ct., at
2753, n. 18; see *id.*, at 937, 102 S.Ct., at
2754. It is firmly [50]established that a de-
fendant in a § 1983 suit acts under color of
state law when he abuses the position giv-
en to him by the State. See *Monroe v.
Pape*, 365 U.S., at 172, 81 S.Ct., at 476.
Thus, generally, a public employee acts un-
der color of state law while acting in his
official capacity or while exercising his re-
sponsibilities pursuant to state law. See,
*e.g., Parratt v. Taylor*, 451 U.S., at 535–

factfinding, let alone passed upon this Eighth
Amendment issue. We decline to address it
here in the first instance, particularly in light of
settled doctrine that we avoid constitutional
questions whenever possible. See *Spector Mo-
tor Service, Inc. v. McLaughlin*, 323 U.S. 101,
105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944); *Jean
v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992,
2997, 86 L.Ed.2d 664 (1985).

536, 101 S.Ct., at 1913; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–1606, 26 L.Ed.2d 142 (1970). See also *Flagg Bros., Inc. v. Brooks*, 436 U.S., at 157, n. 5, 98 S.Ct., at 1734, n. 5.

Indeed, *Polk County v. Dodson*, relied upon by the Court of Appeals, is the only case in which this Court has determined that a person who is employed by the State and who is sued under § 1983 for abusing his position in the performance of his assigned tasks was not acting under color of state law. The Court held that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." 454 U.S., at 325, 102 S.Ct., at 453. In this capacity, the Court noted, a public defender differs from the typical government employee and state actor. While performing his duties, the public defender retains all of the essential attributes of a private attorney, including, most importantly, his "professional independence," which the State is constitutionally obliged to respect. *Id.*, at 321–322, 102 S.Ct., at 451. A criminal lawyer's professional and ethical obligations require him to act in a role independent of and in opposition to the State. *Id.*, at 318–319, 320, 102 S.Ct., at 450. The Court accordingly concluded that when representing an indigent defendant in a state criminal proceeding, the public defender does not act under color of state law for purposes of § 1983 because he "is not acting on behalf of the State; he is the State's adversary." *Id.*, at 323, n. 13, 102 S.Ct., at 452, n. 13. See also *Lugar v. Edmondson Oil Co.*, 457 U.S., at 936, n. 18, 102 S.Ct., at 2753, n. 18.

**B**

[5] We disagree with the Court of Appeals and respondent that *Polk County* dictates a conclusion that respondent did ₍₅₎not act under color of state law in providing medical treatment to petitioner. In

contrast to the public defender, Doctor Atkins' professional and ethical obligation to make independent medical judgments did not set him in conflict with the State and other prison authorities. Indeed, his relationship with other prison authorities was cooperative. "Institutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve." *Polk County*, 454 U.S., at 320, 102 S.Ct., at 451. The Manual governing prison health care in North Carolina's institutions, which Doctor Atkins was required to observe, declares: "The provision of health care is a joint effort of correctional administrators and health care providers, and can be achieved only through mutual trust and cooperation." [9] Similarly, the American Medical Association Standards for Health Services in Prisons (1979) provide that medical personnel and other prison officials are to act in "close cooperation and coordination" in a "joint effort." Preface, at i; Standard 102, and Discussion. Doctor Atkins' professional obligations certainly did not oblige him to function as "the State's adversary." *Polk County*, 454 U.S., at 323, n. 13, 102 S.Ct., at 452, n. 13. We thus find the proffered analogy between respondent and the public defender in *Polk County* unpersuasive.

[6] Of course, the Court of Appeals did not perceive the adversarial role the defense lawyer plays in our criminal justice system as the decisive factor in the *Polk County* decision. The court, instead, appears to have misread *Polk County* as establishing the general principle that professionals do not act under color of state law when they act in their professional capacities. The court considered a professional not to be subject to suit under § 1983 unless he was exercising "custodial or supervisory" authority. 815 F.2d, at 995. To the extent this Court in *Polk County* relied on the fact that the public defender is a "professional" in concluding

**9.** North Carolina Division of Prisons Health Care Procedure Manual § 100.5. See App. to

Brief for Petitioner 8a.

nder, Doctor At-
cal obligation to
l judgments did
h the State and
Indeed, his rela-
authorities was
l physicians as-
mission that the
ion, attempts to
i54 U.S., at 320,
anual governing
i Carolina's insti-
ins was required
he provision of
t of correctional
care providers,
through mutual
Similarly, the
ation Standards
isons (1979) pro-
l and other pris-
close cooperation
nt effort." Pref-
and Discussion.
l obligations cer-
function as "the
'k County, 454
Ct., at 452, n. 13.
red analogy be-
public defender
isive.

rt of Appeals did
rial role the de-
c criminal justice
ctor in the Polk
urt, instead, ap-
Polk County as
rinciple that pro-
er color of state
heir professional
isidered a profes-
t to suit under
rcising "custodial
y.   815 F.2d, at   ·
s  Court in Polk
t that the public
al" in concluding

that he 152was not engaged in state action,
the case turned on the particular profes-
sional obligation of the criminal defense
attorney to be an adversary of the State,
not on the independence and integrity gen-
erally applicable to professionals as a class.
Indeed, the Court of Appeals' reading
would be inconsistent with cases, decided
before and since *Polk County,* in which
this Court either has identified profession-
als as state actors, see, *e.g., Tower v. Glo-
ver,* 467 U.S. 914, 104 S.Ct. 2820, 81
L.Ed.2d 758 (1984) (state public defenders),
or has assumed that professionals are state
actors in § 1983 suits, see, *e.g., Estelle v.
Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50
L.Ed.2d 251 (1976) (medical director of
state prison who was also the treating phy-
sician). See also *Youngberg v. Romeo,* 457
U.S. 307, 322–323, and n. 30, 102 S.Ct. 2452,
2461–2462, and n. 30 (1982) (establishing
standards to determine whether decisions
of "professional" regarding treatment of
involuntarily committed can create liability
for a due process violation). Defendants
are not removed from the purview of

**10.** We do not suggest that this factor is entirely
irrelevant to the state-action inquiry. Where
the issue is whether a *private* party is engaged in
activity that constitutes state action, it may be
relevant that the challenged activity turned on
judgments controlled by professional standards,
where those standards are not established by
the State. The Court has held that "a State
normally can be held responsible for a private
decision only when it has exercised coercive
power or has provided such significant encour-
agement, either overt or covert, that the choice
must in law be deemed to be that of the State."
*Blum v. Yaretsky,* 457 U.S., at 1004, 102 S.Ct., at
2786 (decisions of physicians and administra-
tors of privately owned and operated nursing
home to transfer Medicaid patients not state
action); *Rendell–Baker v. Kohn,* 457 U.S. 830,
840, 102 S.Ct. 2764, 2770–2771, 73 L.Ed.2d 418
(1982) (discharge decisions of privately owned
and operated school not state action).  In both
*Blum* and *Rendell–Baker,* the fact that the pri-
vate entities received state funding and were
subject to state regulation did not, without
more, convert their conduct into state action.
See *Blum v. Yaretsky,* 457 U.S., at 1004, 102
S.Ct., at 2785–2786; *Rendell–Baker v. Kohn,* 457
U.S., at 840–843, 102 S.Ct., at 2770–2772. The
Court suggested that the private party's chal-
lenged decisions could satisfy the state-action
requirement if they were made on the basis of

§ 1983 simply because they are profession-
als acting in accordance with professional
discretion and judgment.[10]

153The Court of Appeals' approach to de-
termining who is subject to suit under
§ 1983, wholeheartedly embraced by re-
spondent, cannot be reconciled with this
Court's decision in *Estelle,* which demon-
strates that custodial and supervisory func-
tions are irrelevant to an assessment
whether the particular action challenged
was performed under color of state law.
In *Estelle,* the inmate's Eighth Amendment
claim was brought against the physician-
employee, Dr. Gray, in his capacity both as
treating physician and as medical director
of the state prison system. See 429 U.S.,
at 107, 97 S.Ct., at 292–293. Gray was
sued, however, solely on the basis of alleg-
edly substandard medical treatment given
to the plaintiff; his supervisory and custo-
dial functions were not at issue. The
Court's opinion did not suggest that Gray
had not acted under color of state law in
treating the inmate.[11] To the contrary, the

some rule of decision for which the State is
responsible. The Court found, however, that
the decisions were based on independent profes-
sional judgments and were not subject to state
direction. Thus, the requisite "nexus" to the
State was absent.

This determination cannot be transformed
into the proposition that no person acts under
color of state law where he is exercising inde-
pendent professional judgment. "[T]he exercise
of ... independent professional judgment," is
not, as the Court of Appeals suggested, "the
primary test." 815 F.2d, at 995, n. 1. And *Blum*
and *Rendell–Baker* provide no support for re-
spondent's argument that a physician, employed
by the State to fulfill the State's constitutional
obligations, does not act under color of state
law merely because he renders medical care in
accordance with professional obligations.

**11.** The Court of Appeals, in our view, misunder-
stood this Court's *Polk County* discussion of
*O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct.
2486, 45 L.Ed.2d 396 (1975), and *Estelle v. Gam-
ble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251
(1976). We observed that *O'Connor* involved
claims against a psychiatrist who served as the
superintendent at a state mental hospital, and
that *Estelle* involved a physician who was the
medical director of the Texas Department of

inference₅₄ to be drawn from *Estelle* is that the medical treatment of prison inmates by prison physicians is state action. The Court explicitly held that "indifference ... manifested by prison doctors in their response to the prisoner's needs ... states a cause of action under § 1983." *Id.,* at 104–105, 97 S.Ct., at 291; see *id.,* at 104, n. 10, 97 S.Ct., at 291 n. 10 (citing with approval Courts of Appeals' decisions holding prison doctors liable for Eighth Amendment claims brought under § 1983 without mention of supervisory and custodial duties). The Court of Appeals' rationale would sharply undermine this holding.[12]

### C

We now make explicit what was implicit in our holding in *Estelle:* Respondent, as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State.

The Court recognized in *Estelle:* "An inmate must rely on prison authorities to treat his medical needs; if the authorities

Corrections and the chief medical officer of a prison hospital. *Polk County,* 454 U.S., at 320, 102 S.Ct., at 450–451. The Court made these observations, however, in the context of contrasting the role of the public defender with that of the physicians in response to the argument that state employment alone is sufficient to fulfill the under-color-of-state-law requirement. See *id.,* at 319–320, 102 S.Ct., at 450. We agree with the dissent in the Court of Appeals that the Court discussed these facts "in order to highlight the cooperative relationship between the doctors and the state and thus the absence of an adversarial relationship akin to that existing between public defenders and the state." 815 F.2d, at 997–998. See *Polk County,* 454 U.S., at 320, 102 S.Ct., at 451 ("Institutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve"). Nothing in the Court's opinion stands for the proposition that a prison physician must be acting in a custodial or supervisory function in order to act under color of state law.

**12.** Furthermore, it would greatly diminish the meaning of a prisoner's Eighth Amendment right, since few of those with supervisory and

fail to do so, those needs will not be met." 429 U.S., at 103, 97 S.Ct., at 290. In light of this, the Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Id.,* at 104, 97 S.Ct., at 291. See also *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293 (1926) (common law requires₅₅North Carolina to provide medical care to its prison inmates), cited in *Estelle,* 429 U.S., at 104, n. 9, 97 S.Ct., at 291, n. 9. North Carolina employs physicians, such as respondent, and defers to their professional judgment, in order to fulfill this obligation. By virtue of this relationship, effected by state law, Doctor Atkins is authorized and obliged to treat prison inmates, such as West.[13] He does so "clothed with the authority of state law." *United States v. Classic,* 313 U.S., at 326, 61 S.Ct., at 1043. He is "a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S., at 937, 102 S.Ct., at 2754. It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care West could receive for his injury was that provided by the State. If Doctor Atkins

custodial functions are likely to be involved directly in patient care. And § 1983 liability is not available under the doctrine of *respondeat superior. Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690–695, 98 S.Ct. 2018, 2035–2038, 56 L.Ed.2d 611 (1978).

**13.** By statute, the North Carolina Department of Correction is required to provide health services to its prisoners. N.C.Gen.Stat. § 148–19 (1987). In compliance with the statute, state regulations charge the Director, Division of Prisons, with the responsibility of providing each prisoner the services necessary to maintain basic health. 5 N.C.Admin.Code § 02E.0201 (1987). State regulations provide that the delivery of health services at each facility is the responsibility of the prison administrator, who must designate a specific health authority "who is charged with the responsibility to provide health services to that facility." § 02E.0202. Pursuant to these provisions, Doctor Atkins was employed by the Director, Division of Prisons, and was paid by the State, to provide orthopedic services to the State's prisoners.

(10)

ill not be met."
t 290. In light
the State has a
der the Eighth
equate medical
s incarcerated.
291. See also
N.C. 487, 490,
ommon law re-
provide medical
cited in *Estelle,*
Ct., at 291, n. 9.
sicians, such as
eir professional
this obligation.
nip, effected by
authorized and
mates, such as
ed with the au-
*nited States v.*
1 S.Ct., at 1043.
fairly be said to
*v. Edmondson*
)2 S.Ct., at 2754.
s authorized by
mate may turn.
ly medical care
injury was that
f Doctor Atkins

ly to be involved
l § 1983 liability is
trine of *respondeat*
*York City Dept. of*
t, 690–695, 98 S.Ct.
l 611 (1978).

olina Department of
vide health services
at. § 148–19 (1987).
te, state regulations
m of Prisons, with
ig each prisoner the
ain basic health. 5
(1987). State regu-
ery of health servic-
esponsibility of the
nust designate a spe-
is charged with the
alth services to that
nuant to these provi-
mployed by the Di-
and was paid by the
dic services to the

misused his power by demonstrating delib-
erate indifference to West's serious medi-
cal needs, the resultant deprivation was
caused, in the sense relevant for state-
action inquiry, by the State's exercise of its
right to punish West by incarceration and
to deny him a venue independent of the
State to obtain needed medical care.

[7, 8]  The fact that the State employed
respondent pursuant to a contractual ar-
rangement that did not generate the same
benefits or obligations applicable to other
"state employees" does not alter the analy-
sis. It is the physician's function within
the state system, not the precise terms of
his employment, that determines whether
his actions can fairly be attributed$_{56}$ to the
State. Whether a physician is on the state
payroll or is paid by contract, the disposi-
tive issue concerns the relationship among
the State, the physician, and the prisoner.
Contracting out prison medical care does
not relieve the State of its constitutional

14. As the dissent in the Court of Appeals ex-
plained, if this were the basis for delimiting
§ 1983 liability, "the state will be free to con-
tract out all services which it is constitutionally
obligated to provide and leave its citizens with
no means for vindication of those rights, whose
protection has been delegated to 'private' actors,
when they have been denied." 815 F.2d, at 998.

15. Contrary to respondent's intimations, the fact
that a state employee's role parallels one in the
private sector is not, by itself, reason to con-
clude that the former is not acting under color
of state law in performing his duties. "If an
individual is possessed of state authority and
purports to act under that authority, his action
is state action. It is irrelevant that he might
have taken the same action had he acted in a
purely private capacity...." *Griffin v. Mary-
land,* 378 U.S. 130, 135, 84 S.Ct. 1770, 1773, 12
L.Ed.2d 754 (1964).

Moreover, although the provision of medical
services is a function traditionally performed by
private individuals, the context in which respon-
dent performs these services for the State (quite
apart from the source of remuneration) distin-
guishes the relationship between respondent
and West from the ordinary physician-patient
relationship. Cf. *Polk County,* 454 U.S., at 318,
102 S.Ct., at 449–450. Respondent carried out
his duties at the state prison within the prison
hospital. That correctional setting, specifically
designed to be removed from the community,
inevitably affects the exercise of professional

duty to provide adequate medical treatment
to those in its custody, and it does not
deprive the State's prisoners of the means
to vindicate their Eighth Amendment
rights.[14]  The State bore an affirmative
obligation to provide adequate medical care
to West; the State delegated that function
to respondent Atkins; and respondent vol-
untarily assumed that obligation by con-
tract.

[9, 10]  Nor does the fact that Doctor
Atkins' employment contract did not re-
quire him to work exclusively for the pris-
on make him any less a state actor than if
he performed those duties as a full-time,
permanent member of the state prison
medical staff. It is the physician's function
while working for the State, not the
amount of time he spends in performance
of those duties or the fact that he may be
employed by others to perform similar
duties, that determines whether he is act-
ing under color of state law.[15]  In the

judgment. Unlike the situation confronting free
patients, the nonmedical functions of prison life
inevitably influence the nature, timing, and
form of medical care provided to inmates such
as West. By regulation, matters of medical
health involving clinical judgment are the pris-
on physician's "sole province." 5 N.C. Ad-
min.Code § 02E.0204 (1987). These same regu-
lations, however, require respondent to provide
medical services "in keeping with the security
regulations of the facility." *Ibid.* The record is
undeveloped as to the specific limitations placed
on respondent by the state prison system. But
studies of prison health care, and simple com-
mon sense, suggest that his delivery of medical
care was not unaffected by the fact that the
State controlled the circumstances and sources
of a prisoner's medical treatment. For one
thing, the State's financial resources are limited.
Further, prisons and jails are inherently coer-
cive institutions that for security reasons must
exercise nearly total control over their residents'
lives and the activities within their confines;
general schedules strictly regulate work, exer-
cise, and diet. These factors can, and most
often do, have a significant impact on the provi-
sion of medical services in prisons. See gener-
ally Neisser, Is There a Doctor in the Joint?
The Search for Constitutional Standards for
Prison Health Care, 63 Va.L.Rev. 921, 936–946
(1977) (describing the institutional effects on
the delivery of health care services in prisons);
M. Wishart & N. Dubler, Health Care in Prisons,

State's employ, respondent |₅₇worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to those the State had incarcerated. Doctor Atkins must be considered to be a state actor.

### III

For the reasons stated above, we conclude that respondent's delivery of medical treatment to West was state action fairly attributable to the State, and that respondent therefore acted under color of state law for purposes of § 1983. Accordingly, we reverse the judgment of the Court of Appeals₅₈ and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, concurring in part and concurring in the judgment.

I agree with the opinion of the Court that respondent acted under color of state law for purposes of § 1983. I do not believe that a doctor who lacks supervisory or other penological duties can inflict "punishment" within the meaning of that term in the Eighth Amendment. Cf. *Johnson v. Glick,* 481 F.2d 1028, 1031–1032 (CA2) (Friendly, J.), cert. denied *sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). I am also of the view, however, that a physician who acts on behalf of the State to provide needed medical attention to a person involuntarily in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the Fourteenth Amendment's protection against the deprivation of liberty without due process. See *Youngberg v. Romeo,* 457 U.S. 307, 315, 324, 102 S.Ct. 2452, 2457–2458, 2462–2463 (1982) (dictum); see generally *Daniels v. Williams,* 474 U.S.

Jails and Detention Centers: Some Legal and Ethical Dilemmas 4 (1983) ("[T]he delivery of medical services in the nation's prisons and jails

327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); *Ingraham v. Wright,* 430 U.S. 651, 672–674, and n. 41, 97 S.Ct. 1401, 1413–1414, and n. 41 (1977); *Rochin v. California,* 342 U.S. 165, 169–174, 72 S.Ct. 205, 208–210, 96 L.Ed. 183 (1952); *Johnson, supra,* at 1032–1033. I note that petitioner's *pro se* complaint merely claimed violation of his rights, and it is the courts that have specified which constitutional provision confers those rights.



487 U.S. 59, 101 L.Ed.2d 56

## |₅₉SUPREME COURT OF VIRGINIA and David B. Beach, its Clerk, Appellants,

v.

### Myrna E. FRIEDMAN.

#### No. 87–399.

Argued March 21, 1988.

Decided June 20, 1988.

Applicant to Virginia bar brought suit alleging that residency requirement violated privileges and immunities clause. The United States District Court for the Eastern District of Virginia entered summary judgment in applicant's favor. On appeal, the United States Court of Appeals for the Fourth Circuit, 822 F.2d 423, affirmed. On appeal, the Supreme Court, Justice Kennedy, held that Virginia's residency requirement for admission to State's bar without examination violated privileges and immunities clause.

Affirmed.

Chief Justice Rehnquist filed dissenting opinion in which Justice Scalia joined.

is beset with problems and conflicts which are virtually unknown to other health care services").





*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Massachusetts Correctional Institution Norfolk*
*2 Clark Street, P. O. Box 43*
*Norfolk, Massachusetts 02056*
*Tel. (617) 727-1480 • (508) 668-0800*
*Fax: (617) 727-7168*
www.mass.gov/doc



**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

**Kathleen M. Dennehy**
*Acting Commissioner*

**James Bender**
*Acting Deputy Commissioner*

**Luis S. Spencer**
*Superintendent*

RECEIVED
JAN – 5 200...
LAW LIBRARY

TO:       All Concerned

FROM:     Luis S. Spencer, Superintendent

DATE:     December 29, 2003

RE:       **ANNUAL REVIEW – 103 DOC 601, DIVISION OF HEALTH SERVICES**
          **ORGANIZATION**

I have conducted a review of the above-referenced policy resulting
in the following:

_____    No change of Policy.

__X__       Adopting the DOC Policy.

_____    Waiving the DOC Policy (Not Applicable).

_____    Adopting  DOC  Policy  with  attached  Norfolk
            procedures.

_____    Submitting policy and procedure in its original
            format.

_____    Changes are noted on the attached page(s).

For Use of
Law Library
MCI - Norfolk

LSS\bmj





*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*



**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

*P.O. Box 426*
*Bridgewater, M.A. 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*

**Kathleen M. Dennehy**
*Acting Commissioner*

**James Bender**
*Acting Deputy Commissioner*

To:        Kathleen M. Dennehy

Through: David Nolan, Director, Policy Development and Compliance Unit

From:    Susan J. Martin, Director, Health Services

Date:     December 16, 2003

Re:       **Annual Policy Review 103 DOC 601, Health Services Organization**

Please be advised that 103 DOC 601, Health Services Organization, has undergone an annual review for 2003, and is currently operationally sound. Please include a copy of this memorandum with your current policy as indication that an Annual Review has been completed.

For Use of
Law Library
MCI - Norfolk

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION - HEALTH SERVICES DIVISION

DOC DIVISION OF HEALTH SERVICES - ORGANIZATION
103 DOC 601

TABLE OF CONTENTS

601.01   Responsible Health Authority .........................2
601.02   Relationship with Superintendents .................. 3
601.03   Organization of Division Management .................4
         Health Services Duty Officer.......................4
         Division Management Team...........................4
            Deputy Director ................................4
            Regional Administrator .........................5
            Mental Health Administrators ...................8
            Special Projects Manager .......................8
601.04   Contractual Medical Providers ......................9
         Senior Medical Consultant......................... 9
         Senior Mental Health Consultant...................10
         Program Director..................................10
         Medical Director at Bridgewater State Hospital...11
601.05   Committee Structure ...............................11
         Health Services Executive Committee...............11
         Quality Assurance Mortality Review Committee.....12
         Quality Assurance Suicide Review Committee.......13
         Medical Records Committee.........................14
         Policies and Procedures Committee.................14
601.06   Administrative Meetings ...........................16
         Lemuel Shattuck Hospital..........................16
         Quarterly Regional Meetings.......................16
         Case Conference Meetings..........................16
         Monthly Regional/Mental Health Administrator
            Meetings ......................................17
601.07   Administrative Reports ............................17
601.08   Health Service Audits .............................17



For Use of
Law Library
MCI Norfolk



| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: Health Services |
|---|---|
| TITLE: Health Services Organization | NUMBER: 103 DOC 601 |

**PURPOSE:** The purpose of this policy is to establish the organization of the Massachusetts Department of Correction health services division

**REFERENCES:** MGL, Ch. 124, S 1 c q and S 18; MGL 125, S 14
ACA Standard: 3-4326, 3-4327, 3-4328, 3-4329, 3-4334
NCCHC Standard: P-02, P-03, P-04, P-05

**APPLICABILITY:** Health Service     **PUBLIC ACCESS**: Yes
Division, Contractual Medical Provider

**LOCATION:** DOC Central Policy File                     Facility
Policy File

Health Services Division Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**
Director of Health Services
Superintendent

**PROMULGATION DATE:** 7-17-02          **EFFECTIVE DATE:** 8-17-02

**CANCELLATION:** This policy cancels all previous department policy statements, bulletins, directives, orders, notices, rules, and regulations regarding health services division organization which are inconsistent with this policy.

**SEVERABILITY CLAUSE:** If any part of this policy is for any reason held to be in excess of the authority of the Commissioner, such decision will not affect any other part of this policy.

For Use of
Law Library
DECEMBER 2003          MCI - Norfolk

## 601.01 Responsible Health Authority

The overall health authority for the Department of Correction is the Director of Health Services. As health authority, the Director of Health Services is responsible for arranging and providing accessible quality medical, dental and mental health care to all inmates, according to the standards of the American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC) and applicable regulations. In carrying out that responsibility, the Director of Health Services delegates the on-site authority to each facility's health services administrator who is a full time employee of the contractual medical provider. As the facility health authority, the health service administrator is responsible for arranging all levels of health care and forensic mental health services and for assuring that all inmates have access to quality medical and mental health care.

The Director of Health Services will provide oversight of administration, organization and planning of medical, mental health and dental services provided by the contractual medical provider.

The Director of Health Services shall have the responsibility to:

1.  Recommend to the Commissioner and Deputy Commissioner and contractual program director policies which relate to the delivery of health services to inmates in the care and custody of the Department;

2.  Perform contract development, negotiation, and supervision of the vendor selection process;

3.  Review and approve procedures that are developed by the contractual medical provider relating to health care delivery;

For Use of
Law Library
MCI - Norfolk



4.   Assist and advise superintendents in meeting the specific health care needs of their facility's population;

5.   Prepare an annual budget for the delivery of health care services in the Department's facilities;

6.   Ensure that the contractual medical provider meets its responsibility for providing quality medical, dental, and mental health services for inmates/ detainees at each DOC facility and forensic mental health services for patients at Bridgewater State Hospital as required by the contractual agreement;

7.   Assist the contractual medical provider to determine the health care personnel staffing patterns for each facility;

8.   Oversee an external organizational process for reviewing, planning, monitoring, and managing the quality and appropriateness of care provided to inmates by the contractual medical provider;

9.   Ensure contract compliance by monitoring and evaluating the quality and efficiency of the contractual clinical services;

10.   Approve and ensure that the contractual medical provider participates in a quality assurance program;

11.   Oversee and ensure utilization review of all health services provided to inmates not covered under a contractual health care agreement;

12.   Approve all division of health service policies and procedures;

DECEMBER 2003

For Use of
Law Library
MCI - Norfolk



13. Prepare budgets and provide financial management of division operations including payroll functions;

14. Provide fiscal monitoring of contractual medical services; and

15. Supervise accounting, purchasing and resource allocation functions of the division.

601.02    Relationship with Superintendents

Health care delivery within each facility is a mutual concern of the Department and contractual clinical provider. Matters of clinical judgment are the sole province of the licensed health care professionals (ie physician, dentist), however, all health care providers shall ensure that the delivery of health care is in accordance with the security requirements of the facility as determined by the superintendent. The Director of Health Services and the division management team will establish close communication with all superintendents to assure that these mutual interests are properly represented.

601.03    Organization of Division Management

1.   The following personnel shall comprise the health services division management team:

a.   Director of Health Services
b.   Deputy Director of Health Services
c.   Mental Health Administrator
d.   Regional Administrators
e.   Special Projects Manager

2.   Health Services Duty Officer

The Deputy Director, Regional Administrators, Mental Health Regional Administrator and Special Projects Manager shall function as the health service duty officer on a regular rotational



basis during non-business hours in addition to their other responsibilities.

3.  Job Duties for the Division Management Team

    a.  The Deputy Director of health services shall report directly to the Director of Health Services and shall function as the acting Director of Health Services in his/her absence.

        The Deputy Director shall routinely have the delegated authority to:

        i.    Assist with the development of requests for response (RFRs) and the supervision of the vendor selection process;
        ii.   Assist with contract development, negotiation and administration;
        iii.  Provide direct administrative supervision of division staff;
        iv.   Oversee organizational process for planning, reviewing, and monitoring the quality and appropriateness of care provided by the contractual medical provider;
        v.    Oversee the quality assurance/quality improvement program implemented by the contractual medical provider;
        vi.   Ensure utilization review of all health services provided to inmates not covered under the contractual clinical agreement;
        vii.  Monitor the contractual medical provider's compliance with appropriate standards and regulations;
        viii  Monitor and implement division of health services policies and procedures.
        ix.   Assist in the preparation of budgets and in the financial management of division operations including payroll

For Use of
Law Library
MCI - Norfolk

functions;

    x.   Assists in the fiscal monitoring of contractual medical services;

   xi.   Assists in the supervision of accounting, purchasing and resource allocation functions of the division;

  xii.  Provide administrative oversight of health services provided to inmates not covered under the contractual clinical agreement;

b.   Administrators regional areas of responsibility

   i. The Mental Health Administrator shall be responsible for monitoring and evaluating the quality of mental health services throughout the Department. The mental health administrator will monitor the contractual medical provider's compliance with appropriate standards, regulations and contract requirements.

  ii.  Regional administrators shall be responsible for monitoring and evaluating the quality of health services and will be assigned designated facilities from the following list:

> **Bay State Correctional Center, Boston Pre-Release Center, Bridgewater State Hospital, MCI Cedar Junction, Concord, MCI Framingham, Massachusestts Alcohol and Substance Center (MASAC), Massachusetts Treatment Center, MCI Norfolk, North Central Correctional Center, Old Colony Correctional Center Medium and Minimum, MCI Plymouth, Pondville Correctional Center, MCI Shirley Medium and Minimum, South Middlesex Correctional Center, Souza**

For Use of
Law Library
MCI Norfolk

DECEMBER 2003



**Baranowski Correctional Center**

c.   The six Regional Administrators shall report to the Deputy Director and may function as the Acting Deputy Director in the event of the Deputy Director's absence. The Regional Administrators shall routinely have the delegated authority to:

i.   Oversee the overall quality and effectiveness of contractual health services by providing direct, on-site monitoring of services;

ii.   Ensure all contractual health services provided to inmates is of high quality and in compliance with National Commission on Correctional Health Care, American Correctional Association and professional standards, and Massachusetts Department of Public Health regulations;

iii.   Act as liaison to the superintendents at assigned facilities as well as being on-call in order to ensure facility needs are being met;

iv.   Conduct and document random audits, every four months, at each facility using predetermined performance criteria as well as approved standards of care and practice;

v.   Ensure compliance with health services division (103 DOC 600 series) policies;

vi.   Review the quality of documentation in medical records;

vii.   Serve as a resource to the assigned facility's management team in order to provide input and evaluation of the quality of contractual clinical services being provided.

d.   The Contract Manager shall routinely have the delegated responsibility to:

For use of
Law Library
MCI - Norfolk

DECEMBER 2003



i.   Audit all reports submitted by the contractual medical provider for contract compliance and identification of issues.

ii.  Attend each medical records committee meeting (see 601.05, 6.).

iii. Attend each policy and procedure committee meeting.

iv.  Act as liaison with the State Office of Pharmacy Services (SOPS).

e.   The <u>Mental Health Regional Administrator</u> shall report directly to the Deputy Director and may function as the Acting Deputy Director in the event of the Deputy Director's absence.

f.   The Mental Health Regional Administrator shall routinely have the delegated authority to:

i.   Oversee the overall quality and effectiveness of contractual mental health services by providing direct, on-site monitoring of services;

ii.  Ensure all contractual mental health services provided to inmates is of high quality and in compliance with National Commission on Correctional Health Care, American Correctional Association and professional standards; and Massachusetts Department of Mental Health regulations;

iii. Conduct random audits at each facility using predetermined performance criteria as well as approved standards of care and practice;

iv.  Ensure compliance with health services division policies;

v.   Review the quality of documentation in medical records;

For Use of
Law Library
MCI - Norfolk



> vi. Serve as a resource to the assigned
>     facilities' management team in order to
>     provide input and evaluation of the
>     quality of contractual mental health
>     services being provided.

f.  The Special Projects Manager shall report
    directly to the Deputy Director and may
    function as the Acting Deputy Director in
    the event of the Deputy Director's absence.

    The Special Projects Manager shall routinely
    have the delegated authority to:

For Use of
Law Library
MCI - Norfolk

i.  Review, and revise for the Director's
    approval all policies and procedures
    for the Health Services Division;

ii. Provide direct supervision of support
    staff; and

iii. Handle all special inquires and
     projects as directed by the Director
     and Deputy Director.

## 601.04   Contractual Medical Providers

The Department shall ensure that contractual
arrangements are maintained with licensed
practitioners or practitioner group(s) for the
provision of all medical, mental health, dental, and
forensic mental health services. This includes the
disciplines of medicine, psychiatry, nursing, social
work, psychology, mental health workers, lab and x-ray
technicians, physician assistants, nurse
practitioners, pharmacists, occupational and physical
therapists, dietitians, dentists, dental assistants
and other paramedical or technical support staff.

The contractual medical provider shall be chosen
through a competitive selection process and shall be
required to comply with all Department policies and
procedures. Each health services contract shall be

approved by the Director of Health Services and Deputy Director.

The provider shall have the sole and exclusive right to hire and fire or terminate personnel working for them and their subcontractor(s). The director of health services may deny entrance of any personnel to any or all facilities. He/she will notify the provider's program director of such denials and the reason for them as soon as reasonably practical.

The following key contractual professional personnel shall provide the services listed below:

1.  The Senior Medical Consultant shall be a licensed physician who shall advise the Director of Health Services on matters relating to clinical programs and protocols. This individual shall undertake special projects that are delegated by the Director of Health Services and shall be responsible for developing peer review mechanisms for contractual medical care providers. It will be necessary for him/her to participate in Quality Assurance Mortality Reviews. The Senior Medical Consultant shall not be involved in the provision of direct care to inmates of the Department.

**For Use of Law Library MCI - Norfolk**

2.  The Senior Mental Health Consultant shall be a licensed psychiatrist who shall report to the Director of Health Services and advise him/her on matters relating to the mental health and forensic mental health services provided by the contractual clinical group. This individual shall undertake special projects which are delegated by the director of health services and shall be responsible for developing peer review mechanisms for contractual psychiatric care providers. It will be necessary for this individual to participate in quality assurance suicide reviews. The Senior Mental Health Consultant shall not be

(14)

> involved in the provision of direct care to
> inmates/ of the Department.

3.  The Program Director of the contractual clinical
    group shall report to the Director of Health
    Services for administrative supervision. The
    program director shall be responsible for the
    overall clinical supervision of medical treatment
    in the facilities as well as administrative
    supervision of all medical, mental health,
    forensic mental health, paramedical, and
    ancillary personnel under the auspices of his/her
    contractual clinical group. Any subcontracts
    utilized by the contractual clinical group shall
    have an administrator designated by the program
    director. No significant subcontracts shall be
    granted by the program director without the prior
    written consent of the Director of Health
    Services.

4.  The Medical Director at Bridgewater State
    Hospital shall be appointed pursuant to MGL
    c.125, Section 18, which reads as follows: "The
    Commissioner, with approval of the Commissioner
    of mental health, shall appoint a physician as
    medical director of the Bridge-water state
    hospital. The medical director shall have the
    care of the inmates thereof and govern them in
    accordance with rules and regulations approved by
    the Commissioner. (Added by St.1955, c 770,
    Section 11.)"

For Use of
Law Library
MCI - Norfolk

601.05    Committee Structure

With the contractual medical provider, the Director of
Health Services shall establish the following
committees in order to maintain proper communication
and to provide a forum for the discussion of important
issues. Each committee meeting shall be documented
with minutes which shall be maintained in the division
of health services.

## 1.   Health Services Executive Committee:

The Director of Health Services shall establish a
health services executive committee which shall meet
as needed. This committee shall be utilized for the
discussion and resolution of current issues and
problems identified relating to the medical record
audits, the systematic review of resulting variance
reports and the provision of medical, dental, mental
health and forensic mental health care at Department
facilities. Problem identification items that are
submitted by the Superintendents and Regional
Administrators will be reviewed as well. Attendees at
these meetings shall include, but not be limited to,
the following individuals:

   a.   Director of Health Services;
   b.   Deputy Director of health services;
   c.   Program Director of the contractual medical
        provider;
   d.   Director of Mental Health Services of the
        contractual medical provider;
   e.   Program Medical Director of the contractual
        medical provider;
   f.   Health Services Division support staff
        (recorder); and
   g.   Health Services Division Contract Manager.

## 2.   Quality Assurance Mortality Review Committee:

   a.   The Director of Health Services shall
        designate a Mortality Review Committee in
        accordance with 103 DOC 622, Death
        Procedures. This Committee shall convene on
        site at the facility where an inmate death
        has occurred. All members of this committee
        shall be present for the entire proceeding.

        The following individuals or their designees
        will comprise the Mortality Review
        Committee:

DECEMBER 2003



       i.   Director of Health Services or designee
       ii.  Regional Administrator of the facility
            involved
       iii. Senior Medical Consultant and/or Senior
            Mental Health Consultant
       iv.  Superintendent of facility or designee
            where death occurred (as an observer)

   b.  This Committee shall be utilized for
       reviewing reports of on-site response teams,
       interviewing staff involved in the emergency
       response and care of the inmate, and
       preparing a confidential preliminary report.

       i.   Each preliminary report shall be
            considered complete and ready for
            review after the preliminary findings
            of the medical examiner are received by
            the Director of Health Services.
       ii.  Deaths that occur with inmates who are
            inpatients at outside hospitals or
            medical facilities beyond 72 hours,
            including the Lemuel Shattuck Hospital,
            are beyond the jurisdiction of the
            mortality review committee and shall
            not be included in this process
            consistent with 103 DOC 622, Death
            Procedures, section 14.
       iii. The Mortality Review Committee shall
            per-form a complete review of the
            medical record and supporting
            documentation, interview staff who were
            directly and indirectly involved in the
            care of the inmate, discuss the events,
            symptoms and medical procedures
            involved in each death, and issue to
            the Director of Health Services
            specific recommendations which address
            any needs identified during the review
            process. These recommendations shall
            then be submitted to the superintendent

For Use of
Law Library
MCI - Norfolk

DECEMBER 2003

601-13



> involved and the Program Director of the contractual clinical group.
>
> iv.  See 601.05, section 5, for deaths as a result of an actual or suspected suicide.

3.  Quality Assurance Suicide Review Committee:

Whenever a death has occurred as a result of an actual or suspected suicide the Director of Health Services shall order that the Quality Assurance Mortality review committee expand to include a psychiatric suicide review (see 103 DOC 622, Death Procedures). In addition to the previously listed members of the Mortality Review Committee, the Senior Mental Health Consultant as well as the Mental Health Regional Administrator shall attend the quality assurance suicide review. In addition, the following shall occur:

a.  In the event of attempted suicides by inmates/ detainees/patients the Director of Health Services will determine whether or not it is necessary to convene a Quality Assurance Suicide Review Committee.

b.  The Director of Health Services will convene a case review panel for an inmate who may be at risk of harm to him/herself at any time upon the request of a Superintendent. If a panel is convened, a report with recommendations shall be submitted to the Superintendent and Program Director of the contractual medical provider.

4.  Medical Records Committee:

The Director of Health Services shall ensure that through the contractual medical provider a Medical Records Committee is developed for the purpose of discussing current issues, including electronic medical records and, problems relating

For Use of
Law Library
only - Special

DECEMBER 2003

to policies, procedures, and record keeping. The commit-tee members shall review, revise, and amend medical records forms and medical, dental, and Mental Health forms as appropriate.

The Program Director of the contractual medical provider shall formally appoint members to this committee and submit their names to the Director of Health Services. A Regional Administrator shall attend each meeting of the Medical Records Committee.

5.    Policies and Procedures Committee

The Policies and Procedures Committee will have a joint membership of the health services division and the contractual medical provider and shall meet as needed. A Regional Administrator shall attend each meeting of the Policies and Procedures Committee.

The purpose of this Committee is to oversee the development of policies and procedures in accordance with NCCHC and ACA Standards, in conformance with Massachusetts regulations and policies, and the rules and regulations promulgated by the Massachusetts Department of Public Health.

For Use of
Law Library
MCI Norfolk

The contractual medical provider's policies and procedures shall not be in conflict with Department of Correction policies. The office of the Director of Health Services shall review for approval all the contractual medical provider's policies and procedures. The DOC Health Services Division office shall perform annual reviews of each of the 600 Series policies and issue revisions as made to the contractual medical provider. The contractual medical provider shall review on an annual basis all of its policies and procedures and revise as appropriate. Each Health Services Administrator and/or site with



health services shall have a copy of 103 DOC 600
series and the contractual medical provider's
policies and procedures available to any and all
health services staff and DOC personnel.

There are policies and procedures unique to
Bridgewater State Hospital. These should be
reviewed and approved by the reviewing authority
at BSH, the Superintendent or designee, and
approved by the Director of Health Services.

601.06   Administrative Meetings

In addition to those formal Committees listed in the
previous section of this policy, the following
meetings shall be held as deemed necessary by the
Director of Health Services:

1.   Quarterly meetings shall be held at the Lemuel
     Shattuck Hospital for the purpose of maintaining
     communication with the Shattuck Hospital staff.
     The following individuals shall attend this
     meeting:



     a.   Director of Health Services or Deputy
          Director of Health Services;
     b.   Superintendent of the Shattuck Hospital
          Correctional Unit or Deputy Superintendent;
     c.   Program Director of the contractual medical
          provider;
     d.   designated staff members of the Shattuck
          Hospital.

2.   Quarterly regional meetings shall be held with
     the Superintendents of individual facilities, the
     Director of Health Services and the Deputy
     Director of Health Services, the Health Services
     Regional Administrator for that facility, the
     contractual medical provider Program Director,
     Health Services Administrator for the facility,
     and Medical Director as well as other designated
     contractual staff.

DECEMBER 2003



> The quarterly meeting held at Bridgewater State Hospital is called The Bridgewater State Hospital Governing Board.
>
> The purpose of these meetings will be to discuss issues regarding the provision of medical, dental, mental and forensic mental health services at the individual facilities.

3.  The Director of health services shall, at his/her discretion, or at the written request of a Superintendent, convene a case conference meeting to discuss important health and mental health care issues relating to a particular inmate. Case conference meetings represent an interdisciplinary approach to the treatment needs of a particular individual. Attendance shall be determined by the Director of Health Services and the Program Director of the contractual medical provider.

4.  Monthly meetings of the Director of Health Services or Deputy Director with all Regional Administrators and the Mental Health Regional Administrator will be held for the purpose of maintaining communication. Minutes will be taken at these meetings.

## 601.07    Administrative Reports

The Director of Health Services or her/his designee shall establish that routine administrative reports are to be submitted by the contractual medical provider on a regular basis. A list of the required reports shall be contained within the written contract between the Department and the contractual medical provider.

## 601.08    Health Service Audits

1.  Comprehensive audits of medical, dental and mental health services will be conducted at each

DECEMBER 2003

For Use of
Law Library
بعد Norfolk

601-17



major facility at least every four months by DOC Health Services Division management team members using a predetermined audit tool.

2.  At any time, and as determined by the Department, the medical records audit will be supplanted by an audit from one of the following categories: Infirmary Audit, Keep on Person (KOP), Self Administration Audit, and Special Needs/Chronic Disease Audit.

3.  Additional audits may be performed from time to time as determined by the Director of Health Services.

4.  The Department Policy Development and Compliance Unit conducts annual audits at each facility, including health services to measure compliance with ACA standards. Regional administrators may participate as members of this audit team.

For Use in
Law Library
MCI - Norfolk

DECEMBER 2003









*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Massachusetts Correctional Institution Norfolk*
*2 Clark Street, P. O. Box 43*
*Norfolk, Massachusetts 02056*
*Tel. (617) 727-1180 • (508) 668-0800*
*Fax: (617) 727-7168*
*www.mass.gov/doc*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

Michael T. Maloney
*Commissioner*

Kathleen M. Dennehy
*Deputy Commissioner*

Luis S. Spencer
*Superintendent*

TO:       All Concerned

FROM:     Luis S. Spencer, Superintendent

DATE:     August 8, 2003

RE:       **REVIEW – 103 DOC 610, CLINICAL CONTRACT PERSONNEL AND THE
          ROLE OF DOC HEALTH SERVICES**

I have conducted a review of the above-referenced policy resulting
in the following:

_____   No change of Policy.

__X__     Adopting the DOC Policy.

_____   Waiving the DOC Policy (Not Applicable).

_____   Adopting  DOC  Policy  with  attached  Norfolk
          procedures.

_____   Submitting policy and procedure in its original
          format.

_____   Changes are noted on the attached page(s).

For Use of
Law Library
MCI - Norfolk

LSS\bmj





*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

*P.O. Box 426*
*Bridgewater, M.A. 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*

Michael T. Maloney
*Commissioner*

Kathleen M. Dennehy
*Deputy Commissioner*

TO:        Superintendents/Unit Directors

FROM:    Susan J. Martin, Director, Health Services Division *Martin*

SUBJECT:  Annual Review of Policy 103 DOC 610, Clinical Contract Personnel and the Role
          of DOC Health Services Division

DATE:     June 17, 2003

---

Please be advised that 103 DOC 610, Clinical Contract Personnel and the Role of DOC Health
Services Division has undergone an annual review for 2003. I am proposing some revisions. In
order to facilitate your review, proposed new language will be indicated in bold print while
proposed deletions will be indicated by strikeouts.

1.   610.02     Contractual Clinical Personnel

**For Use of**
**Law Library**
**M C I - Norfolk**

2.   Health care, including psychiatric services, shall be discussed at
     least quarterly at documented administrative meetings between the
     on-site Medical Director, the Health Service Administrator, the
     Superintendent of the facility and other members of the health care
     and correctional staffs, as appropriate. Regular monthly statistical
     reports shall be submitted to the superintendent by the health
     services administrator, along with an annual summary report, to
     include at least the number of inmates receiving health services by
     category of care, operative procedures, referrals to specialists,
     **prescriptions written, laboratory and x-ray tests completed,
     infirmary admissions (if applicable), onsite or offsite hospital
     admissions, serious injuries or illness,** HIV testing, TB testing,
     emergency services and inmate deaths. In addition, there will be a
     health service staff meeting at least monthly to review
     administrative procedural issues.

2.   610.02     7.   The Program Medical Director of the contractual group and each
                      designated Medical Director shall monitor the health care services
                      rendered by non-physician personnel **mid-level practitioners** as
                      follows:

Superintendents/Unit Directors
Annual Policy Review 103 DOC 610
June 17, 2003
Page 2

> a. Evidence of ~~semi-annual~~ **quarterly** supervision of all physician assistants **and nurse practitioners** shall be kept on file with the contractual provider.
>
> b. A current list of supervising physicians for individual physician assistants **and nurse practitioners** shall be forwarded to the Massachusetts Board of Registration in Medicine with a copy sent to the Director of Health Services.

3.   610.02   11. The Director of Health Services may deny entrance of any contractual personnel to any <u>or</u> all sites, and shall notify the Program Director of such denial and the reasons for it as soon as is practical. Within one week of the denial the Director of Health Services, the Program Director, and the Superintendent of the effected site ~~will meet in order to discuss~~ **shall communicate** the reasons for and circumstances surrounding the denial. After a review of the denial, along with any additional information concerning the situation resulting in the denial, the Director of Health Services shall render a final decision regarding the initial denial of entrance and may elect to reinstate the individual or to uphold the denial status.

4.   610.02   13. The Program Medical Director shall monitor the health services provided by all **primary care** physicians, **psychiatrists, dentists, nurse practitioners, physician assistants, psychologists,** either as independent contractors, employees or subcontractors and perform a formal annual peer review on each ~~physician~~ **practitioner.** Written peer review documentation will be kept by the Program Medical Director as confidential information according to current rules, regulations and laws. However, documentation shall be provided to the Director of Health Services indicating that a peer review has taken place, the date of the review, the name of the physician reviewed and that the review is duly recorded and filed in the office of the Program Medical Director.

For Use of
Law Library
MCI - Norfolk

5.   610.03   <u>Role of the Division of Health Services</u>

The contractual provider shall participate in a quality assurance program established and required by the Director of Health Services and the contractual Program Director. **The contractual provider shall provide documentation of its quality assurance efforts to the Health Services Director.** ~~This program will include but not be limited to peer review, utilization review, risk management, regular chart review and quarterly meetings of a Quality Assurance Committee.~~ **The Medical contractor shall establish a system of internal review that will include the following:**



Superintendents/Unit Directors
Annual Policy Review 103 DOC 610
June 17, 2003
Page 3

1. **participation in a multidisciplinary committee;**
2. **collection and analysis of data together with planning, intervention and reassessment;**
3. **evaluation of data to improve access, quality and utilization of resources;**
4. **onsite monitoring of outcomes through chart review, investigation of complaints, grievances and health records, review of medication practices and monitoring of corrective action plans;**
5. **review of all deaths, suicides, attempted suicides and illness outbreaks;**
6. **implement measures to resolve problems;**
7. **re-evaluate previously implemented measures;**
8. **incorporate measure in training plans;**
9. **maintain minutes and records of proceedings;**
10. **issue quarterly reports to the health authority of findings and corrective action plans;**
11. **comply with all legal requirements regarding peer review statues and confidentiality of medical records.**

For Use of
Law Library
MCI - Norfolk

6.   610.04      <u>Health Training for Correctional Personnel</u>

1.   The goal of the Department is to establish and maintain a training program such that correctional and other personnel are trained to respond to health-related situations. ~~within a four-minute response time.~~ The contractual provider will work with the Department to provide education material and instruction on a variety of necessary medical and mental health issues, including but not limited to the following:

   a.   administration of first aid and CPR **within a four minute response time**,

2.   Each Superintendent or designee will ensure that:

   a.   all correctional officers are trained **annually** ~~within the past 2 years~~ in basic first aid;

4.   Each superintendent will ensure that a substantial portion of the staff present on each shift (i.e. 75% or more) ~~has been trained~~ **had health training**, that the training is current and the facility has an ongoing **health** training program.



COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
HEALTH SERVICES DIVISION

103 DOC 610
CLINICAL CONTRACT PERSONNEL AND THE ROLE OF DOC HEALTH SERVICES

TABLE OF CONTENTS

610.01  General Policy.........................................2
610.02  Contractual Clinical Personnel........................2
610.03  Role of the Division of Health Services...............6
610.04  Health Training for Correctional Personnel............7
610.05  Inmate Workers........................................8
610.06  Students and, Interns.................................9

For use of
Law Library
MCI - Norfolk



For Use of
Law Library
MCI - Norfolk

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: HEALTH SERVICES |
|---|---|
| TITLE: CLINICAL CONTRACT PERSONNEL AND THE ROLE OF DOC HEALTH SERVICES | NUMBER: 103 DOC 610 |

**PURPOSE:** To establish general Health Services standards for clinical staff contracted to provide medical, dental, mental health and forensic mental health services in Department facilities by defining qualifications and specific responsibilities of those personnel. This includes health related training and education of Department personnel and inmates, staffing, and quality assurance. In addition, this policy will clarify the role of the Division of Health Services as it relates to the contractual provider(s).

**REFERENCES:**   MGL C 124, § 1(c), (q).; 243 CMR 3.05; 103 CMR 485
ACA Standard: 3-4326, 3-4327, 3-4328, 3-4334, 3-4335, 3-4338, 3-4340, 3-4363, 3-4364, 3-4369. NCCHC Standard: P-03, P-04, P-05, P-06, P-09, P-18, P-19, P-20, P-21, P-22 P-23, P-24, P-25, P-52

**APPLICABILITY:** Staff/Inmates      **PUBLIC ACCESS:** Yes

**LOCATION:** DOC Central Policy File, Facility Policy File, Health Services Division Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:** Director of Health Services, Superintendents, Contractual Medical Provider Program Director

**PROMULGATION DATE:** November 1995   **EFFECTIVE DATE:** 09-17-03

**CANCELLATION:** This policy cancels all previous Department policy statements, bulletins, directives, orders, notices, rules or regulations regarding Health Services standards for clinical contractual staff.

**SEVERABILITY CLAUSE:** If any article, section, subsection, sentence, clause or phrase of this policy is for any reason held to be unconstitutional, contrary to statute, in excess of authority of the Commissioner or otherwise inoperative, such decision shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of this policy.



For Use of
Law Library
MCI - Norfolk

### 610.01    General Policy

In concert with the Division of Health Services, the contractual medical provider shall be solely responsible for making all decisions with respect to the type, timing and level of services needed by inmates covered under the contractual agreement with the Department of Correction. The Department of Correction Health Services Division shall ensure that all contractual medical, nursing, dental, mental health, forensic mental health and support staff shall have qualifications and experience consistent with those of their respective professions in the general community. The qualifications of contractual clinical staff shall be in compliance with all applicable requirements for licensure, certification, or registration in effect in the Commonwealth of Massachusetts.

1.    The Health Services Division shall ensure that the contractor provides each facility having on-site clinical personnel with written job descriptions that define the specific duties and responsibilities of these personnel. These job descriptions shall have approval of the Director of Health Services or designee and shall be reviewed at least annually.

2.    Matters of medical, mental health and dental judgment are the sole province of the responsible physicians, psychiatrists or dentists.

3.    The contractual medical provider will maintain a manual of written policies and defined procedures specifically developed for the individual facilities and approved by the Director of Health Services. All policies and procedures will be in compliance with the American Correctional Association (ACA), the National Commission of Correctional Health Care (NCCHC) Standards, and in the case of Bridgewater State Hospital with JACHO standards and shall be reviewed at least annually for necessary revisions. When there is a conflict between standards the more restrictive will be adhered to.

### 610.02    Contractual Clinical Personnel

The selection of contractual medical providers by the Department shall be achieved through a competitive selection process in accordance with 801 CMR 21.00. Physician coverage, as well as other clinical coverage in Department facilities will be defined



through the contractual agreement between the Department and contractors. Any changes in staffing patterns (matrices) made during the life of an agreement must be pre-approved by the Director of Health Services.

Each professional group shall have a Program Director who shall report directly to the Director of Health Services for administrative supervision.

1.  The Program Medical Director of the contractual medical provider group shall be responsible for clinical supervision of all contractual staff who provide services within the Department under their contractual agreement. The Program Medical Director of the contractual group will designate a Medical Director at all facilities covered by the agreement, who will be responsible for health services at that facility and be responsible for final medical judgments.

2.  Health care, including psychiatric services, shall be discussed at least quarterly at documented administrative meetings between the on-site Medical Director, the Health Service Administrator, the Superintendent of the facility and other members of the health care and correctional staffs, as appropriate. Regular monthly statistical reports shall be submitted to the superintendent by the health services administrator, along with an annual summary report, to include at least the number of inmates receiving health services by category of care, operative procedures, referrals to specialists, prescriptions written, laboratory and x-ray tests completed, infirmary admissions (if applicable), onsite or offsite hospital admissions, serious injuries or illness, HIV testing, TB testing, emergency services and inmate deaths. In addition, there will be a health service staff meeting at least monthly to review administrative procedural issues.

3.  The contractual provider shall insure that all physicians providing services to Department facilities shall be licensed in the Commonwealth of Massachusetts to the extent required by 243 CMR, Board of Registration in Medicine, S3.05 and shall submit verification of such compliance within three months of the date that the physician commences the provision of services to the Department. The Department shall specify requirements for board

For Use of
Law Library
MCI - Norfolk



certification or eligibility in the contractual agreements
for physician services of a specialty nature.

4.    The Program Director of the contractual provider shall
      designate   an   individual(s)   to   conduct   physician
      credentialing and each physician shall be re-credentialed
      every 2 years. All credentialing records shall be the
      property of the Department of Correction.

5.    The contractual provider shall insure that all other
      personnel shall be licensed, certified or registered to the
      extent required by law to perform the requirements of their
      positions in the Department facilities. The contractual
      provider shall conduct any credentialing required of these
      staff as may be required by the pertinent regulatory
      authorities.

6.    The contractual provider shall insure that all clinical
      personnel complete all continuing education requirements
      necessary for licensure and receive at least 12 hours of
      continuing   education   or   staff   development   that   is
      appropriate for their position.
      All qualified health care professionals who have patient
      contact must have current training in cardiopulmonary
      resuscitation (CPR).

7.    The Program Medical Director of the contractual group and
      each designated Medical Director shall monitor the health
      care services rendered by mid-level practitioners as
      follows:

      a.    Evidence of quarterly supervision of all physician
            assistants and nurse practitioners shall be kept on
            file with the contractual provider.

      b.    A   current   list   of   supervising   physicians   for
            individual   physician   assistants   and   nurse
            practitioners shall be forwarded to the Massachusetts
            Board of Registration in Medicine with a copy sent to
            the Director of Health Services.

8.    All contractual personnel must receive security clearance
      by the Department prior to the provision of services. This
      will   include   a   Board   of   Probation,   NCIC   check   and
      fingerprinting.   Whenever   either   a   NCIC   check   or

For Use of
Law Library
MCI - Norfolk

fingerprint card is returned as problematic, the Director of Health Services will take appropriate action.

9. All contractual personnel shall be subject to all rules and regulations of the Department which are set forth in the Departmental "Blue Book".

10. Through the contractual provider, the Division of Health Services will ensure that an adequate number of health care staff members of varying types are available commensurate with the scope of services provided at the individual facilities. The Health Services Administrator at each facility shall recommend the health care personnel requirements in all categories in order to provide inmate access to health care staff and services. · Such recommendations shall be reviewed by the program director and the Director of Health Services on a regular basis. The staffing levels shall be reviewed at least annually by the Director of Health Services or designee.

11. The provider shall have the sole and exclusive right to hire and fire contractual personnel. A Superintendent may deny entrance of any contractual personnel to their facility. The Superintendent shall notify the Director of Health Services of such denial and the reason(s) for it as soon as is practical. The Director of Health Services will notify the Program Director as soon as possible.

   The Director of Health Services may deny entrance of any contractual personnel to any or all sites, and shall notify the Program Director of such denial and the reasons for it as soon as is practical. Within one week of the denial the Director of Health Services, the Program Director, and the Superintendent of the effected site shall communicate the reasons for and circumstances surrounding the denial. After a review of the denial, along with any additional information concerning the situation resulting in the denial, the Director of Health Services shall render a final decision regarding the initial denial of entrance and may elect to reinstate the individual or to uphold the denial status.

12. The contractual provider will submit to the Director of Health Services a written staffing plan, for each facility – all shifts, that assures a sufficient number of health services staff of varying types is available to provide




For Use of
Law Library
MCI - Norfolk

adequate    evaluations    and    treatment    consistent    with
community standards.    The Director of Health Services will
review and approve the plan on an annual basis.

13.  The  Program  Medical  Director  shall  monitor  the  health
     services    provided    by    all    primary    care    physicians,
     psychiatrists,  dentists,  nurse  practitioners,  physician
     assistants,    psychologists,    either    as    independent
     contractors,  employees  or  subcontractors  and  perform  a
     formal  annual  peer  review  on  each  practitioner.    Written
     peer  review  documentation  will  be  kept  by  the  Program
     Medical  Director  as  confidential  information  according  to
     current rules, regulations and laws. However, documentation
     shall  be  provided  to  the  Director  of  Health  Services
     indicating  that  a  peer  review  has  taken  place,  the  date  of
     the  review,  the  name  of  the  physician  reviewed  and  that  the
     review  is  duly  recorded  and  filed  in  the  office  of  the
     Program Medical Director.

     The Program Medical Director shall provide the Director of
     Health  Services  with  a  copy  of  the  most  recent  Peer  Review
     policy  and  procedure,  to  include  but  not  be  limited  to  the
     peer  review  documentation  process  and  sample  forms  which
     will be utilized throughout the process.

## 610.03    Role of the Division of Health Services

The  primary  role  of  the  Division  of  Health  Services  is  to
supervise  and  provide  an  external  organizational  process  for
reviewing,  planning,  monitoring,  and  managing  the  quality  and
appropriateness  of  care  provided  to  inmates  by  the  contractual
medical  provider.  The  main  focus  of  Health  Services  is  to  ensure
contract  compliance  by  monitoring  and  evaluating  the  quality  and
efficiency  of  the  contractual  services.    (See  103  DOC  601,
Division of Health Services Organization.)

The  contractual  provider  shall  participate  in  a  quality
assurance  program  established  and  required  by  the  Director  of
Health  Services  and  the  contractual  Program  Director.    The
contractual  provider  shall  provide  documentation  of  its  quality
assurance  efforts  to  the  Health  Services  Director.  The  Medical
contractor  shall  establish  a  system  of  internal  review  that  will
include the following:

1.  participation in a multidisciplinary committee;



2.  collection and analysis of data together with planning, intervention and reassessment;
3.  evaluation of data to improve access, quality and utilization of resources;
4.  onsite monitoring of outcomes through chart review, investigation of complaints, grievances and health records, review of medication practices and monitoring of corrective action plans;
5.  review of all deaths, suicides, attempted suicides and illness outbreaks;
6.  implement measures to resolve problems;
7.  re-evaluate previously implemented measures;
8.  incorporate measure in training plans;
9.  maintain minutes and records of proceedings;
10. issue quarterly reports to the health authority of findings and corrective action plans;
11. comply with all legal requirements regarding peer review statues and confidentiality of medical records.

For Use v.
Law Library
MCI - Norfolk

610.04    Health Training for Correctional Personnel

1.  The goal of the Department is to establish and maintain a training program such that correctional and other personnel are trained to respond to health-related situations. The contractual provider will work with the Department to provide education material and instruction on a variety of necessary medical and mental health issues, including but not limited to the following:

    a.  administration of first aid and CPR within a four minute response time,
    b.  recognizing the need for emergency care in life-threatening situations (i.e. chest pain and potential suicide);
    c.  methods of obtaining assistance;
    d.  recognizing acute manifestations of certain chronic illnesses (i.e. seizures, intoxication and withdrawal, and adverse reaction to medication);
    e.  recognizing other chronic conditions (i.e. mental illness, retardation, chemical dependency and developmental disability);
    f.  response to emergency or disaster conditions;
    g.  monitoring of such chronic illnesses as diabetes, epilepsy, TB and AIDS;
    h.  completion of intake screening;



For Use of
Law Library
MCI - Norfolk

    i.    responses and treatment for the character disordered and sexually aggressive offenders,

    j.    procedures for appropriate disposition and referral to appropriate medical facilities or health care providers;

    k.    suicide risk identification and prevention; and

    l.    Precautions and procedures with respect to infectious and communicable diseases.

2.    Each Superintendent or designee will ensure that:

    a.    All correctional officers are trained annually in basic first aid;

    b.    All correctional officers are trained, certified and recertified in cardiopulmonary resuscitation (CPR) similar to that defined by the American Red Cross; and

    c.    At a minimum, one health-trained staff person or correctional officer per shift is trained in cardiopulmonary resuscitation (CPR) and recognition of symptoms of illnesses common to inmates.

3.    Each facility shall follow a written suicide prevention and intervention procedure which has been approved by the Director of Health Services (refer to contractual mental health manual) as mandated by 103 DOC 650, <u>Mental Health Services.</u>

4.    Each superintendent will ensure that a substantial portion of the staff present on each shift (i.e. 75% or more) had health training, that the training is current and the facility has an ongoing health training program.

610.05    <u>Inmate Workers</u>

In all Department facilities, inmate workers shall be prohibited from performing the following tasks:

1.    Performing direct patient care services. This restriction, however, should not preclude inmates from participating in a certified vocational training program;

2.    Scheduling health care appointments;



For Use of
Law Library
MCI - Norfolk

3.   Determining access of other inmates to health care services;

4.   Handling or having access to surgical and dental instruments, syringes, needles, medications, and health records;

5.   Operating diagnostic or therapeutic equipment.

6.   Inmates who are involved in handling biohazardous wastes (i.e. dirty linens or utensil) must receive appropriate training and materials (i.e. blood spill clean up, PPE).

### 610.06   Students, and Interns

Students and interns from the community shall be allowed to provide services in a facility Health Services Unit only upon the joint approval of the Director of Health Services, the facility Superintendent, and the Program Medical Director of the contractual provider. Wherever students and interns are utilized to assist in the delivery of health and mental health care services, the contractual provider shall establish a written job description which includes the basis of selection, required training, length of services, definition of tasks, supervision, and responsibilities.

1.   All students and interns shall be oriented to the security regulations of the facility and responsible for compliance with these procedures.

2.   All students, and interns shall be oriented to the Department procedures governing Criminal Offenders Record Information (CORI) and shall be required to comply with these regulations.

3.   Any students or interns who may be involved in health or mental health care delivery shall do so only under direct staff supervision commensurate with their level of training.

4.   Prior to placement within a facility the student(s) or intern(s) must attend the Department of Correction New Employee Orientation Program (40 hour training program) as well as any training program(s) stipulated by the contractual provider